IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| SILKROAD TRANZ, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:24-cv-13 |
| | ) |
| PAYNE TRUCKING CO., | ) |
| Registered Agent: Daniel Payne | ) JURY TRIAL DEMANDED |
| 10411 Hall Industrial Drive | ) |
| Fredericksburg, Virginia 22408, | ) |
| | ) |
| Defendant. | ) |
| | ) |

# COMPLAINT

Silkroad Tranz, Inc., for its complaint against Payne Trucking Co. for defamation and tortious interference, states as follows:

1. For a small trucking business like Silkroad Tranz, Inc., reputation—especially among carrier brokers—is ***everything***. Defendant Payne Trucking Co., which is a competing carrier and was acting as a broker in this case, knowingly and maliciously lied about Silkroad, accusing them of fraud and "unethical or deceptive business practices." Defendant posted these lies on Carrier411, one of the biggest carrier ratings networks, in the form of a "FreightGuard Report," knowing that this report would brand Silkroad as an unethical carrier to all brokers. This defamation has caused half of Silkroad's trucks, which are normally hauling goods across the United States and keeping shelves stocked, to sit idle. Even after providing Defendant with proof that its allegations were false, Defendant refused to remove or

retract the defamatory report for weeks, permanently damaging Silkroad's reputation and causing tremendous damage. Silkroad seeks to hold Defendant accountable for the damages caused by its malicious lies.

## Parties

2. Plaintiff Silkroad Tranz, Inc. ("Silkroad") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal office located at 3008 State Road, Bensalem, Pennsylvania 19020. Silkroad is a small trucking company engaged in interstate commerce.

3. Defendant Payne Trucking Co. is a corporation formed and existing under the laws of Ohio, registered to do business in the Commonwealth of Virginia, and with its corporate headquarters located at 10411 Hall Industrial Drive, Fredericksburg, Virginia 22408.

## Venue and Jurisdiction

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332. Defendant Payne Trucking is domiciled in Virginia, while Silkroad is domiciled in Pennsylvania. Further, the amount in controversy is greater than $75,000. Thus, this Court has diversity jurisdiction over this action

5. Defendant Payne Trucking is subject to personal jurisdiction within the Commonwealth of Virginia for purposes of the Constitution's Due Process Clause and the Commonwealth's long-arm statute because Defendant Payne Trucking resides within the Eastern District of Virginia.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b), and the events giving rise to these claims have occurred in, or otherwise touch and concern, the Eastern District of Virginia.

## Factual Allegations

7. Silkroad is a small trucking company that owns 28 trucks and, prior to the events described herein, had 28 drivers. It carries cargo of all types across the United States. Silkroad gets the vast majority of its business from larger carrier brokers, who rely on Carrier411 as the industry standard for carrier reviews and ratings.

8. As a small business trusted to move millions of dollars' worth of cargo that needs to get to its destination quickly and safely, Silkroad depends, for its survival, on its reputation for integrity, responsibility, and timeliness.

9. Prior to the defamatory publication described herein, Silkroad enjoyed a sterling reputation, with only a single negative review on Carrier411, and regularly earned over $700,000 per month, representing Silkroad's full capacity, with none of its trucks sitting idle for any longer than necessary for the drivers to have their allotted time off and required rest.

10. Indeed, the economically devastating supply-chain crisis that began in 2020, and the related problem of truck driver shortages—both of which continue to plague the transportation industry to this day—ensured that Silkroad's trucks and drivers were constantly in demand. As a result of the events described below, that demand was cut in half.

11. On January 25, 2023, Defendant, acting as a carrier broker, engaged Silkroad to deliver pallets of salt from New York to Defendant's customer, Chesapeake Spice Company ("CSC"), in Maryland.

12. A driver for Silkroad picked up the salt and delivered it the next day, as requested. Unfortunately, while maneuvering the truck to deliver the pallets at CSC's warehouse facility, the Silkroad driver went over a curb and caused minor damage to the sod.

13. On March 2, 2023, CSC filled out a "Damage Claim Form," addressed to Payne Transportation LP, P.O. Box 67, Grp. 200, R.R. #2, Winnipeg, MB [Canada] R3C 2E6, describing "damage to property and landscaping" in the amount of $1,420.00 (the "Claim Form"), and emailed it with supporting documents—including photographs and a repair estimate—to Defendant Payne Trucking, Co. Silkroad has no affiliation with Payne Transportation LP, Silkroad was not copied on the email, Defendant did not forward the email or Claim Form to Silkroad, and Silkroad did not otherwise receive the Claim Form until 21 days later.

14. It was not until March 23, 2023, that CSC forwarded the email with the Claim Form and supporting documents to Silkroad. This was the first time Silkroad received the claim for property damage associated with the salt delivery. Silkroad promptly acknowledged the claim and began working diligently to investigate and resolve it.

15. Title 49 of the Code of Federal Regulations, Part 370, which governs the investigation and disposition of damage claims in the transportation industry, gives

4

carriers 30 days to acknowledge a claim upon receipt thereof. 49 CFR § 370.5(a). Carriers have 120 days from receipt of the claim to investigate it and either pay, decline to pay, or offer a compromise settlement. 49 CFR § 370.9(a).

16. Silkroad accepted responsibility for the damages on April 11, 2023. On April 17, 2023, Silkroad emailed CSC a proposed hold harmless agreement. On April 18, 2023, Silkroad mailed a check to CSC for $1,420.00, which CSC received and deposited. Silkroad, therefore, fully resolved the claim within 26 days.

17. Simultaneously, Bart Weil, an employee of Defendant and acting on its behalf, was attempting to renege on paying Silkroad for the salt delivery for an unrelated reason. Weil claimed that Defendant had not received a certificate of insurance listing Defendant as an additional insured (the "COI"). Silkroad had, however, provided Defendant with the requested COI on January 31, 2023.

18. On April 11, 2023, when Silkroad inquired into why Defendant was still withholding payment, even after receiving the COI, Weil falsely asserted that Defendant had not previously received the COI. In this email, seemingly out of nowhere and for no apparent reason, Weil brought up the CSC damages claim.

19. Silkroad promptly responded to Weil that day, providing him with the email proof that it sent the COI on January 31 and advised that if payment was not forthcoming, Silkroad would proceed with a claim against Defendant's bond insurance. Silkroad also acknowledged that it was "well aware" of the CSC claim and was "working diligently to resolve it."

5

20. Defendant finally paid Silkroad for the CSC delivery on April 14, 2023. Weil, however, was not through with Silkroad.

21. On or about April 17, 2023, Weil, on behalf of Defendant, submitted a FreightGuard Report to Carrier 411, alleging "fraudulent activity" and "unethical or deceptive business practices." In support of these allegations, Weil stated in the report that "[Silkroad] caused property damage at a consignee [CSC.] They were provided with clear pictures showing their truck causing the damage. [Silkroad] acknowledged their driver caused the damage but *will not respond to multiple requests for payment dating back to January*. Placed on do not use." (emphasis added).

22. At the time it submitted the FreightGuard Report, Defendant was fully aware that CSC had not submitted its Claim Form until *March*. Defendant was also aware that Silkroad was actively working to resolve CSC's claim. Defendant falsely accused Silkroad of ignoring "multiple requests for payment *dating back to January*" and baselessly accused Silkroad of committing "fraudulent activity" and "unethical or deceptive business practices."

23. At the time that it submitted the FreightGuard Report, Defendant was aware of Title 49 of the Code of Federal Regulations, and that Silkroad was well within the time limits for acknowledgment and resolution of a claim for damages.

24. On April 17, 2023, at 12:44 p.m., Carrier411 notified Silkroad of the FreightGuard Report, giving it 72 hours to respond, and informed Silkroad that depending upon the response, Carrier411 "may make [Defendant's] report available

to other transportation intermediaries". Notice of the FreightGuard Report is attached hereto as **Exhibit 1**.

25. A negative FreightGuard Report, like the one published by Defendant, causes a notice to be sent out to carrier brokers who might otherwise be interested in hiring the carrier. Even before the report is "released," carrier brokers receive notifications of an "unreleased" FreightGuard report, which itself, even without the full contents available to the broker, causes brokers to skip over to another carrier.

26. Indeed, within an hour of Defendant initially publishing the FreightGuard Report, Silkroad received a cancelation from one of its brokers, stating that they could no longer use Silkroad because of the "unreleased freight guard from 1 hour ago." This was the first of many cancelations.

27. A negative FreightGuard Report, particularly one that alleges fraud, can be devastating to a carrier, as the brokers will simply pass them up in favor of another carrier without that Scarlet Letter. For this reason, FreightGuard Reports are subject to abuse and are sometimes used by brokers to gain leverage over carriers or to retaliate against them.

28. Defendant, as both a carrier and a broker who utilizes Carrier411, was well aware of the loss of business that would result to Silkroad from the FreightGuard Report.

29. Silkroad responded to Carrier411 the same day, disputing the allegations.

30. Also that day, Silkroad responded directly to Defendant via email to dispute the allegations. Silkroad provided a detailed timeline, with attached documents—all already in Defendant's possession—proving that Defendant's allegations in the FreightGuard Report were false. Silkroad specifically notified Defendant that the allegations were "slanderous" and demanded their retraction.

31. Upon receiving the dispute email from Silkroad, Defendant was still well within Carrier411's 72-hour publishing window. Defendant, therefore, had ample opportunity and time to retract its false statements before they caused additional and irreparable harm to Silkroad.

32. The next morning, April 18, 2023—still within that window of opportunity—another employee of Defendant acknowledged Silkroad's dispute email, stating, "I spoke with Bart [Weil]".

33. Silkroad promptly responded, specifically asking, "Did Bart Weil have any base [sic] to say we have committed Fraud and ignored the claim? Does he have a single email?"

34. Defendant responded within minutes, stating, "I'm not sure why Bart did what he did. I don't handle that part of things."

35. Silkroad again responded that same morning, asking, "Who handles that part of things, can you advise?"

36. Defendant ignored Silkroad's question. Later that afternoon, however—still within the time window that Defendant could have retracted its defamatory report—Defendant acknowledged that the claim by CSC seemed to have been

"worked out." And yet, Defendant still did not retract or remove the false FreightGuard Report.

37. The next day, April 19, 2023—still within Carrier411's 72-hour window—Silkroad again asked Defendant why it had not yet retracted its defamatory FreightGuard Report.

38. Despite knowing that the report was false to begin with, despite numerous notifications and warnings about the slanderous nature of the allegations, and despite *acknowledging* the falsity of the central claim of the report, Defendant still chose not to retract or remove the false FreightGuard Report.

39. On or about April 20, 2023, Defendant's defamatory FreightGuard Report was fully released on Carrier411, flagging Silkroad as an unethical carrier to all other carrier brokers.

40. As a direct result, Silkroad has lost roughly half of its business. Before Defendant's false FreightGuard Report, Silkroad consistently operated at full capacity. Immediately after the report, carrier brokers began to cancel jobs with Silkroad, and its volume of work cratered.

41. Silkroad reached out to multiple brokers by phone to try and recoup business and the response from the brokers was consistent: they could no longer do business with Silkroad because of Defendant's FreightGuard report. In one email, a broker canceled a job stating that Silkroad was now "DNU"—meaning Do Not Use—due to Defendant's FreightGuard Report and advised Silkroad "*please do not reach out to us going forward.*" (emphasis added). In another email, a broker canceled when

9

the Silkroad driver was already en route, saying that their compliance department would not allow Silkroad to pick up the load because of Defendant's FreightGuard Report.

42. Defendant's false report has caused roughly half of Silkroad's trucks to sit idle, it has caused a precipitous drop in revenue, and has caused Silkroad to operate at a loss.

43. Because its trucks were idle, four of Silkroad's drivers resigned, with more expected to follow, crippling Silkroad from being able to deliver even if they received the previous level of business opportunities.

44. Prior to publication of the FreightGuard Report, for the month of March 2023, Silkroad generated $790,442 in revenue, and earned a net income of $106,523. The three months prior to that tell a similar story, with no month below $680,000 in revenue.

45. Defendant initially published the FreightGuard report on April 17, 2023, and the impact was immediate and significant. For the month of April 2023, Silkroad generated only $488,748 in revenue, and operated at a net **loss** of $91,508. This sudden loss of revenue is expected to continue.

<u>Causes of Action</u>

COUNT I
Defamation and Defamation Per Se

46. Silkroad incorporates by reference the above and subsequent paragraphs as though set forth fully herein.

47. Defendant published and purposely caused to be published false and defamatory statements on a Carrier411 FreightGuard Report, which did and had the tendency to harm Silkroad and its reputation. The defamatory FreightGuard Report was and continues to be viewed by countless carrier brokers.

48. Defendant's statements in the FreightGuard Report accused Silkroad of engaging in "fraudulent activity" and "unethical or deceptive business practices." Defendant's statements in the FreightGuard Report further accused Silkroad of refusing to respond to "multiple requests for payment dating back to January."

49. Defendant's statements in the FreightGuard Report were false.

50. These false statements, and the implications to be drawn from them, were and would be reasonably understood to be statements of fact about Silkroad.

51. The FreightGuard Report submitted by Defendant to Carrier411 is defamatory because the intention and effect was to injure Silkroad's reputation, affecting its trade, business, and profession, by accusing Silkroad of engaging in fraudulent activity, unethical or deceptive trade practices, and ignoring multiple requests for payment on a damage claim for months. The false statements created an unsavory opinion of Silkroad and its business in the minds of a substantial portion of its potential clients in the transportation industry.

52. Defendant's false statements about Silkroad are defamatory *per se* because they impute unfitness to perform the duties of Silkroad's business and a want of integrity in the discharge of its duties, and it certainly prejudices Silkroad in its profession or trade.

53. Defendant acted with fault, at least negligence, and with actual malice.

54. No reasonable person could believe that Silkroad had ignored a claim for damages "dating back to January" when the claim was not submitted until March. Additionally, no reasonable person under these circumstances could believe that Silkroad had engaged in fraud or unethical business practices when Silkroad had already acknowledged the CSC claim, accepted responsibility, and was still well within the time limits for acknowledging and resolving a claim under Title 49 of the Code of Federal Regulations.

55. More than that, however, Defendant knew its defamatory statements were false or recklessly disregarded the truth or falsity of the statements when it published them.

56. Aside from its actual knowledge or reckless disregard at the time of initial publication to Carrier411, Defendant's malice and intent to damage Silkroad's business is further evidenced by its refusal to remove the FreightGuard Report during Carrier411's 72-hour release window, even after acknowledging that the central issue—the supposedly ignored and unpaid CSC damage claim—had been "worked out." Defendant's malicious intent is also evidenced by the retaliative nature of the FreightGuard Report, coming just days after the author of the report had been called out by Silkroad for improperly withholding payment on the CSC job.

57. Defendant acted to deliberately and maliciously injure Silkroad, a competitor, from whom it had just attempted to withhold payment on the CSC job, out of hatred, ill-will or spite, and/or for improper motives.

58. The defamatory statements in the FreightGuard Report have directly and proximately caused Silkroad to suffer irreparable harm to its reputation and significant economic losses, all of which are ongoing in nature and will be suffered in the future.

59. As a direct and proximate result of these false statements by Defendant, Silkroad has also suffered and will continue to suffer actual, consequential, and special damages in an amount to be proven at trial, believed to be at least $1,200,000.

60. Silkroad is also entitled to punitive damages because Defendant acted with actual malice and ill-will and spite towards Silkroad and for improper motives.

61. Defendant's defamatory statements continue to be published on the Carrier411 network, causing imminent, ongoing, and irreparable harm to Silkroad's business, and therefore, Silkroad is entitled to emergency injunctive relief to remove the defamatory statements.

## COUNT II
### Tortious Interference with Business Expectancy

62. Silkroad incorporates by reference the above and subsequent paragraphs as though set forth fully herein.

63. Prior to the events described herein, Silkroad had contract expectancies with carrier brokers that had retained Silkroad or intended to retain Silkroad. Silkroad also had a reasonable expectancy of prospective business relationships and continued economic advantage as a clean-rated carrier on Carrier411.

64. Defendant had knowledge of Silkroad's contracts and prospective contracts and was aware of Silkroad's expectancy of prospective business relationships and economic advantage as a reputable carrier on Carrier411.

65. It is reasonably certain that absent Defendant's false and defamatory statements in its FreightGuard Report on Carrier411, that Silkroad would have continued in its contract relationships and realized its expectancy of prospective business relationships and economic advantage.

66. Defendant utilized improper means to intentionally interfere with Silkroad's contract expectancy and its prospective business relationships and economic advantage. Specifically, Defendant negligently, knowingly, or recklessly published lies about Silkroad as detailed above on Carrier411.

67. As a direct and proximate result of Defendant's tortious interference, Silkroad has suffered and will continue to suffer actual, consequential, and special damages in an amount to be proven at trial, believed to be at least $1,200,000.

68. Defendant's defamatory statements continue to be published on Carrier411, causing imminent, ongoing, and irreparable harm to Silkroad's business, and therefore, Silkroad is entitled to emergency injunctive relief to remove the defamatory statements.

## Jury Demand

Plaintiff Silkroad demands a trial by jury on all issues so triable.

<u>Prayer for Relief</u>

WHEREFORE, Plaintiff Silkroad Tranz, Inc., demands judgment against Defendant Payne Trucking Co., as follows:

1. Damages to be proven at trial, in excess of $1,200,000;

2. Punitive Damages in an amount to be proven at trial;

3. Injunctive relief prohibiting the publication or republication of the defamatory statements;

4. Costs of suit; and

5. Such other and further relief as the Court deems necessary and proper.

Dated: January 5, 2024                    SILKROAD TRANZ, INC.
                                          By Counsel

BINNALL LAW GROUP, PLLC


/s/ *Jason C. Greaves*
Jason C. Greaves, VSB No. 86164
Jared J. Roberts, VSB No. 97192
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jason@binnall.com
       jared@binnall.com

*Counsel for Plaintiff*